# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| SHARI LYNN BELTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14CV777 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Shari Lynn Belton, seeks review of a final decision of the Commissioner of Social Security denying her claims for social security disability benefits and supplemental security income. The Court has before it the certified administrative record and cross-motions for judgment.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits and supplemental security income in August of 2011 alleging a disability onset date of July 1, 2007, later amended to February 1, 2011. (Tr. 62, 253-57, 259-64, 287, 343.) The applications were denied initially and again upon reconsideration. (*Id.* at 99-100, 147-48, 179-184, 190-207.) A hearing was then held before an Administrative Law Judge ("ALJ") at which Plaintiff, her attorney, and a vocational expert ("VE") were present. (*Id.* at 60-98.) On May 28, 2013, the ALJ determined that Plaintiff was not disabled under the Act. (*Id.* at 46-58.) On July 12, 2014 the

Appeals Council denied Plaintiff's request for review, making the ALJ's determination the Commissioner's final decision for purposes of review. (*Id.* at 1-6.)

## II. STANDARD FOR REVIEW

The scope of judicial review of the Commissioner's final decision is specific and narrow. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). Review is limited to determining if there is substantial evidence in the record to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The issue before the Court, therefore, is not whether Plaintiff is disabled but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *Id.*

## III. THE ALJ'S DISCUSSION

The ALJ followed the well-established five-step sequential analysis to ascertain whether the claimant is disabled, which is set forth in 20 C.F.R. §§ 404.1520 and 416.920. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). Here, the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. (*Id.* at 48.) The ALJ next found that Plaintiff suffered from the following severe impairments: bipolar disorder; anxiety disorder; personality disorder; degenerative joint disease; and degenerative disc disease. (*Id.*) At step three, the ALJ found that Plaintiff did

2

not have an impairment or combination of impairments that meets or medically equals one listed in Appendix 1. (*Id.* at 48-49.) Prior to step four, the ALJ determined Plaintiff's residual functional capacity ("RFC"). (*Id.* at 49-52.) Based on the evidence as a whole, the ALJ determined that Plaintiff retained the RFC to perform a limited range of medium work. (*Id.* at 49.) Specifically, the ALJ further limited Plaintiff to performing only simple, routine, repetitive tasks, with only occasional interaction with others, and without performance of production work or fast-paced jobs with deadlines and quotas. (*Id.* at 49.) At the fourth step, the ALJ determined that Plaintiff was unable to perform any past relevant work. (*Id.* at 52.) At step five, the ALJ determined that, given Plaintiff's age, education, work experience, and RFC, there were other jobs that Plaintiff could perform, such as linen room attendant, laundry worker, and marker. (*Id.* at 53.) Consequently, the ALJ determined that Plaintiff was not disabled through the decision date. (Tr. 53-54.)

## IV. ANALYSIS

### A. Plaintiff's Treating Physician

Plaintiff argues that the ALJ's RFC finding is unsupported by substantial evidence because inadequate weight was afforded to Dr. Dinesh Benjamin's medical opinion. (Docket Entry 7 at 8-11 *referencing* Tr. 425-30.) The treating physician rule, 20 C.F.R. §§ 404.1527(c), 416.927(c), generally requires an ALJ to give controlling weight to the opinion of a treating source as to the nature and severity of a claimant's impairment. Yet, a treating source opinion, like all medical opinions, must be both well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the case record. 20

3

C.F.R. §§ 404.1527(c)(2)-(4) and 416.927(c)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590; *accord Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).

The ALJ's conclusion that Dr. Benjamin's restrictions were inconsistent with the record is supported by substantial evidence. (Tr. 50-52.) First, the ALJ discussed Plaintiff's mental health records in detail, including those from Dr. Benjamin at Carolina Behavioral Care ("CBC"). (*Id.*) Dr. Benjamin treated Plaintiff intermittently between March 2011 and January 2013 for a history of bipolar disorder and borderline personality disorder (Tr. 384-94, 401-409, 411-24, 431-33) and a history of auditory hallucinations and paranoia (*id.* at 384, 388, 392, 421). Plaintiff had also struggled with drugs and alcohol. (Tr. 384, 388, 392, 421.) Dr. Benjamin prescribed Seroquel and, in increasing dosages, it improved Plaintiff's symptoms. (Tr. 384, 386, 388, 390, 392-93, 401, 403-04, 406, 408-09, 411, 414, 417-18, 420, 423, 431-32.)

In May 2012, Dr. Benjamin completed a medical source statement ("MSS"). (Tr. 425-30.) Specifically, Dr. Benjamin opined that Plaintiff experienced a "substantial loss of ability" to respond appropriately to supervision, co-workers, and usual work situations, and to deal with changes in a routine work setting. (Tr. 429.) He further opined that Plaintiff would only be able to maintain concentration about 30 minutes and would be off-task more than 20% of the time. (Tr. 430.) The ALJ explained that he gave the opinion "little weight" because among other things, he found Dr. Benjamin's conclusions inconsistent with "several unremarkable examination findings." (Tr. 51.) *See* 20 C.F.R. §§ 404.1527(c)(4),

4

416.927(c)(4). Treatment records from CBC during the relevant period showed that although Plaintiff occasionally complained of symptoms, including irritability, emotional lability, mood swings, paranoia, and hearing noises (Tr. 388, 401, 407, 415, 418, 421), on most examinations, she was alert and fully oriented, and had normal attention and concentration, no depressive or manic signs, intact thought organization, and no auditory hallucinations or delusions (*id.* at 385, 402, 405, 408, 412, 416, 419, 422, 431-32). These findings supported the ALJ's decision not to accord great or controlling weight to Dr. Benjamin's disability opinion.

There was also an internal inconsistency in Dr. Benjamin's opinion. He found that Plaintiff had moderate difficulties in social functioning and maintaining concentration, persistence, or pace, but found later in his MSS that Plaintiff had a substantial loss of ability to perform certain work-related activities, *e.g.*, responding appropriately to supervision, co-workers, and usual work situations. (Tr. 51, 429-30.) Defendant correctly points out that a substantial loss in ability—meaning that the individual could not perform the particular activity in regular, competitive employment—is more severe than a moderate limitation, which is not indicative of disability.[1] (Tr. 429.) Likewise, with regard to concentration, persistence, or pace, Dr. Benjamin's finding of moderate difficulties in this area was inconsistent with his subsequent MSS finding that Plaintiff was restricted to maintaining attention for about 30 minutes at a time and that she would likely be off task more than 20% of the workday. (Tr. 429-30.) As stated above, given the mental status findings, it was not unreasonable for the

---

[1] Moderate means less than marked. (Tr. 427.) *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C (defining "marked" in the B criteria). A marked limitation is one where the degree of limitation is such as to interfere seriously with an individual's ability to function independently, appropriately, effectively, and on a sustained basis. *Id.*

ALJ to conclude that moderate limitations were more consistent with the evidence.

It was also appropriate for the ALJ to note that Dr. Benjamin's opinion was inconsistent with the several GAF scores that he assessed in the mid-50's.[2]  (Tr. 51, 386, 390, 393, 403, 406, 409, 413, 417, 420, 423, 431.)  Additionally, the ALJ did not rely on the GAF scores alone as indicative of Plaintiff's functioning.  (Tr. 51.)  Rather, the ALJ properly considered Plaintiff's GAF scores in context with the rest of the evidence from Dr. Benjamin in determining what weight to give his MSS.

Despite Plaintiff's assertions to the contrary, Dr. Benjamin's opinion regarding Plaintiff's difficulty maintaining concentration and interacting appropriately with others was not consistent with the opinion from April Harris-Britt, Ph.D., the consultative psychologist. (Docket Entry 7 at 11 *referencing* Tr. 370-75.)  Dr. Harris-Britt opined that although Plaintiff struggled with maintaining concentration, persistence, and pace, she was not precluded from understanding, retaining, and following instructions and not precluded from performing simple, routine, repetitive tasks.  (Tr. 374.)  Similarly, while Dr. Harris-Britt opined that Plaintiff's ability to respond appropriately to supervision or interaction with co-workers was impacted by her symptoms, the doctor also stated that Plaintiff was otherwise self-sufficient in regards to her occupational functioning.  (Tr. 374-75.)  Thus, Dr. Harris-Britt's opinion did not infer disability, as did some of the limitations in Dr. Benjamin's report.  Additionally, the

---

[2] The GAF is a scale ranging from zero to one hundred used to rate an individual's psychological, social, and occupational functioning.  *See* Am. Psychiatric Assoc, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th Ed., Text Revision 2000).  Scores between 51-60 indicate moderate symptoms or moderate difficulties in social, occupational, or school functioning.  *Id.* Although the recent edition of the DSM no longer includes the GAF rating for assessment of mental disorders, the ALJ was not precluded from considering the previously assessed GAF scores as opinion evidence.  *See Emrich v. Colvin*, No. 1:13cv1012, 2015 WL 867287, at *10 (M.D.N.C. Mar. 2, 2015) (unpublished).

State agency review psychologist specifically considered Dr. Harris-Britt's opinion and opined that Plaintiff could maintain attention and concentration to perform simple, routine, repetitive tasks and interact with others and take instructions from a supervisor. (Tr. 105, 108-09, 154, 157-58.) The ALJ did not err in affording little weight to Dr. Benjamin's opinion.

### B. The ALJ's Credibility Analysis

Plaintiff also asserts that the ALJ materially erred in his analysis of Plaintiff's credibility. (Docket Entry 7 at 11-15; Docket Entry 12 at 5-7.) Regarding credibility, *Craig v. Chater* provides a two-part test for evaluating a claimant's statements about symptoms. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing 20 C.F.R. §§ 416.929(b) & 404.1529(b)). If the ALJ determines that such an impairment exists, the second part of the test then requires him to consider all available evidence, including the claimant's statements about pain, in order to determine whether the claimant is disabled. *Id.* at 595-96 (citing 20 C.F.R. §§ 416.929(c) and 404.1529(c)). While the ALJ must consider a claimant's statements and other subjective evidence at step two, he need not credit them to the extent they conflict with the objective medical evidence or to the extent that the underlying impairment could not reasonably be expected to cause the symptoms alleged. *Id.* Where the ALJ has considered the relevant factors and has heard the claimant's testimony and observed his demeanor, the ALJ's

credibility determination is entitled to deference. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

A recent Fourth Circuit case is also relevant here. In *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), the Fourth Circuit found that an ALJ erred by using, at part two of the credibility assessment, "boilerplate" language that "the claimant's statements concerning the intensity, persistence and limiting effects of [his pain] are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *Id.* at 639. This method "'gets things backwards' by implying that ability to work is determined first and is then used to determine the claimant's credibility." *Id.* (quoting *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012)). Instead, "the ALJ [in *Mascio*] should have compared [the claimant's] alleged functional limitations from pain to the other evidence in the record, not to [the claimant's] residual functional capacity." *Id.*

Here, the ALJ satisfied the first step of the credibility inquiry, finding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 50.) Next, the ALJ stated that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained *in this decision*." (*Id.*) To his credit, the ALJ in this case did not use the same objectionable "boilerplate" language used in *Mascio*. Consequently, this case is factually distinct from *Mascio*. Nevertheless, the question of whether the language the ALJ actually did use is any more adequate than the language used in *Mascio* is worth considering. This is because courts have characterized the language used in the ALJ's decision here (*i.e.*, "for the

8

reasons explained in this decision") and concluded that *standing alone* it is meaningless boilerplate akin to the boilerplate used in *Mascio*.[3]  Nevertheless, these cases, including *Mascio*, also teach that any error may be rendered harmless.

For example, in *Mascio*, the Fourth Circuit explained what harmless error looks like, stating that "The ALJ's error would be harmless if he properly analyzed credibility elsewhere." *Mascio*, 780 F.3d at 640.  The Fourth Circuit made it clear that an ALJ discharges this obligation when he "explain[s] how he decided which of [the claimant's] statements to believe and which to discredit."  *Id.* at 6.  However, in *Mascio* the ALJ failed to explain himself accordingly, except to make "the vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering [the claimant's] residual functional capacity."  *Id.*  The lack of an explanation required remand.  *Id.*

The question here, then, is whether the ALJ sufficiently "explain[s] how he decided which . . . statements to believe and which to discredit."  *Id.* at 640.  To answer this question, an understanding of the testimony taken at the hearing, as well as the further details of the ALJ's credibility determination, is in order.

### Plaintiff's Testimony

Plaintiff testified here at considerable length.  She worked for fourteen years as a supervisor for the word processing department of a law firm, which involved hiring, firing, and

---

[3] *See, e.g., Brinson v. Colvin*, 4:12-CV-37-D, 2015 WL 2124778 (E.D.N.C. May 6, 2015) *report and recommendation adopted*, 4:12-CV-37-D, 2015 WL 4133720 (E.D.N.C. July 8, 2015) (unpublished); *Rawlings v. Colvin*, No. 3:14cv00159, 2015 WL 3970608, *9 (S.D. Ohio June 30, 2015) (unpublished); *Velasco v. Colvin*, No. SA CV 14-01432 RZ, 2015 WL 1607796, *1 (C.D. Cal. April 8, 2015) (unpublished).

setting the schedule for eight employees. (Tr. 66.) However, Plaintiff further testified that her inability to concentrate, her paranoia, her anxiety, and the side-effects of her medication now rendered her disabled. More specifically, Plaintiff testified that the medicine she took for her mental illnesses—Seroquel—"slowed [her] down," sometimes made other persons sound "muffled" to her, made her drowsy, and gave her dry mouth. (*Id.* at 69.) Plaintiff noted that her dosage of this drug had increased from 50 milligrams to 400 milligrams over time. (*Id.* at 89.) She further stated that she heard things that were not there, which she called "hallucinations," such as doorbells, knocks on the door, and sometime voices, including those of her mother or father. (*Id.* at 70.) She heard these things both during the day and at night and it frightened her and, when her auditory hallucinations took place at night, they made it difficult for her to sleep. (*Id.* at 71)

Plaintiff testified further that her mental illness had also changed her personality, triggering feelings of persecution (being "attacked") that lead her to start "screaming at [others] and getting really angry and saying things, but then I can't remember later what I said, but then they tell me what I did." (*Id.* at 71-72.) Plaintiff testified that she wakes up feeling "like there's blood all over [her]" and that is how she knows she "went into this angry rage." (*Id.*) Consequently, Plaintiff—who stated that she has tried unsuccessfully to make friends—testified that she tends to stay home because she is afraid that she will lose control over herself and because her medication does not help with these particular symptoms. (*Id.* at 72-73, 87-88.) Despite this, Plaintiff admitted that she went to "Christian meetings" "twice a

week" "to hear sermons," but added that she had not "been going regularly lately" because she felt "like there's some conflict there." (*Id.* at 82-83.)

Plaintiff also testified that she is in "constant pain" because of a "bad knee," though she did not use a cane because she can "hold on to objects" and limp. (*Id.* at 73-74.) She stated that the Motrin she took for pain did not help. (*Id.* at 78.) Then Plaintiff testified that she had day long migraines "every other month" "at one point" and "that's the worst pain ever." (*Id.* at 74.) She testified she could walk a block before she had to stop and rest and that she could stand for about fifteen minutes and sit for about half an hour. (*Id.* at 79.)

Plaintiff also testified that she did wash clothes because she had a washing machine in her bedroom, that she does some rather slow tidying of the house, that she does not cook because she loses concentration and burns the food, and that she likewise loses concentration while shopping—which she does while leaning on a cart—thereby greatly lengthening the shopping process. (Tr. 81-84.) Plaintiff expounded on her inability to concentrate, stating that she would begin projects—like mailing a letter—but never complete them and that she had a difficult time sticking to a schedule, including taking her medication and "being somewhere that [she] say[s] [she is] going to be." (*Id.* at 85-88.)

### *The Testimony of Phyllis Haymer*

Phyllis Haymer also testified at the hearing.[4] (*Id.* at 89.) She testified to seeing Plaintiff four to five days a week and agreed with the contents of Plaintiff's testimony as to her limitations. (*Id.*) She added that sometimes Plaintiff forgets to take her medicine entirely, but that when she takes her medicine she tends to sleep for twelve or more hours afterwards.

---

[4] This analysis also applies to Ms. Haymer's third-party function report. (Tr. 298-305.)

(*Id.* at 90.) Ms. Haymer also expounded on Plaintiff's attendance of Christian meetings, indicating that "something triggered" Plaintiff and that they "basically had to leave" because "it ends up being like an argument." (*Id.* at 92.) Ms. Haymer further testified that even though she attempted to help Plaintiff, Plaintiff would "turn[ ] on [her]," that something would "trigger" Plaintiff, an argument would ensue, that Plaintiff would say and text things in a "rage," and that the next day Plaintiff would not remember what she did. (*Id.* at 92-93.)

### i.    The ALJ's Treatment of Plaintiff's Testimony

Here, after noting that Plaintiff's alleged symptoms were not entirely credible for the reasons he would articulate, the ALJ then moved into a discussion of the objective medical evidence. (*Id.* at 50-52.) The ALJ did not mention any specific testimony from Plaintiff until the end of his RFC analysis, at which point he made the following findings:

> Of particular importance is that the claimant testified to having severe problems sleeping. She said that she hears things that do not allow her to sleep. However, she also stated that the Seroquel makes her drowsy, and her witness, Ms. Haymer, stated that she sleeps 12-15 hours a day. These statements are inconsistent. In any event, in April 2013 the claimant denied experiencing any hallucination symptoms. In August, 2012, she told treating providers that Seroquel was causing daytime sedation, but that it was tolerable.
>
> Also of particular importance is that while the claimant testified to having pain and walking problems, the November 2011 consultative physical examination rendered no substantially debilitating findings. The foregoing supports the above assessment. There is no substantial evidence in the record of any medication side effect that would prevent the claimant from performing work activity.
>
> . . . .

12

Weight was afforded to the Third Party Function Report and to Ms. Haymer's testimony to the extent that they were consistent with the above residual functional capacity assessment.

(Tr. 52.)

The undersigned agrees with Defendant here that the ALJ's credibility determination is both susceptible to judicial review and supported by substantial evidence. Plaintiff characterizes the ALJ as doing nothing more than conducting an erroneous credibility analysis as to Plaintiff's difficulties in sleeping. (Docket Entry 7 at 14.) But the ALJ clearly did more than that, because after pointing to Plaintiff's alleged difficulties in sleeping resulting from auditory hallucinations, he pointed further to evidence on the record that in April 2013 the claimant denied experiencing any hallucination symptoms. (Tr. 52 *referencing* Tr. 398.) The ALJ noted too that in August, 2012, Plaintiff told treating providers that Seroquel was causing daytime sedation, but that it was tolerable. (*Id. referencing* Tr. 411.) Consequently, as to Plaintiff's difficulties in sleeping, the ALJ specifically explained how he decided which of Plaintiff's statements to believe. His credibility analysis in this regard is susceptible to judicial review and supported by substantial evidence.[5]

Substantial evidence also supports the ALJ's decision to only partially credit Plaintiff's allegations of distractablity and interpersonal difficulties. Specifically, the ALJ pointed to

---

[5] Plaintiff only appears to be contesting the ALJ's assessment of her alleged mental limitations. The Court notes in passing, however, that the ALJ also discharged his obligation regarding Plaintiff's alleged physical limitations regarding her knee, by alluding to that testimony and then noting that in November 2011 a consultative physical examination rendered no substantially debilitating findings. (Tr. 51 at 377-380.) The ALJ then tied this finding back to Plaintiff's allegations that she could not work because of the alleged side-effects of Seroquel by noting that there is no substantial evidence in the record of any medication side effect that would prevent the claimant from performing work activity. (Tr. 51.) Once again, the ALJ explained why he chose not to fully accept Plaintiff's testimony and so his decision is susceptible to judicial review and supported by substantial evidence.

13

instances where Plaintiff had self-reported to her physicians that her mood swings and paranoia were well-controlled and that she was feeling better with her medication. (Tr. 50-51 *citing* Tr. 388, 392, 401, 411; *see also* Tr. 384, 386, 391, 394, 404, 406, 414, 418, 420, 423, 431.) The ALJ also pointed to record evidence demonstrating that Plaintiff's allegations of a disabling lack of concentration and an inability to work with others were not entirely credible. For example, the ALJ pointed to the opinion of consultative examiner Dr. Harris-Britt, who opined that although Plaintiff struggled with maintaining concentration, persistence, and pace, she was not precluded from understanding, retaining, and following instructions and not precluded from performing simple, routine, repetitive tasks. (Tr. 50 *referencing* Tr. 374.) Dr. Harris-Britt also opined that Plaintiff's ability to respond appropriately to supervision or interaction with co-workers was impacted by her symptoms, but that Plaintiff was otherwise self-sufficient in regards to her occupational functioning and minimally self-sufficient socially. (Tr. 374-75.)

State agency review psychologists also specifically considered Dr. Harris-Britt's opinion and opined that Plaintiff could maintain attention and concentration to perform simple, routine, repetitive tasks and interact with others and take instructions from a supervisor. (Tr. 105, 108-09, 154, 157-58.) Additionally, all Plaintiff's credible limitations were also accounted for the in RFC. For example, to the extent that Plaintiff had problems interacting with people, *e.g.*, "mild paranoia about other[']s intentions" (Tr. 374), the ALJ limited Plaintiff to only occasional interaction with others (Tr. 49). Likewise, to the extent that Plaintiff had problems with focus and attention and completing tasks, the ALJ limited her

14

to not only simple, routine, and repetitive tasks, but also provided that Plaintiff would "need to avoid production work or similar fast-paced jobs with deadlines and quotas." (*Id.*) These additional limitations directly accounted for problems in stress, attention, and task persistence. For all these reasons, the ALJ's credibility analysis here is susceptible to judicial review and supported by substantial evidence.

### ii. The ALJ's Treatment of Ms. Haymer's Testimony

Plaintiff also contends that the ALJ erred in his treatment of Ms. Haymer's testimony. (Docket Entry 7 at 11-15.) In his decision, as explained in the block quote above, the ALJ briefly mentioned Ms. Haymer's statement that Plaintiff slept a considerable amount of time when she took her medicine. Other than that, the ALJ analyzed Ms. Haymer's lay witness evidence by stating, "Weight was afforded to the Third Party Function Report and to [her] testimony to the extent they were consistent with the above residual functional capacity assessment." (Tr. 52.) The general approach to third party testimony or statements renders harmless the failure of an ALJ to weigh or address the credibility of lay testimony, where the testimony essentially reiterates that of the claimant, and the ALJ properly discredited a claimant's testimony.[6] Here, as explained above, the ALJ's credibility analysis was susceptible to judicial review and supported by substantial evidence. Because Ms. Haymer's

---

[6] *See, e.g., Dyrda v. Colvin*, 47 F. Supp. 3d 318, 325-27 (M.D.N.C. 2014); *McGlothlen v. Astrue*, No. 7:11-CV-148-RJ, 2012 WL 3647411, at *11 (E.D.N.C. Aug. 23, 2012) (unpublished) (finding any error by the ALJ in evaluating the lay witness opinion to be harmless because the ALJ properly discredited claimant's testimony which was similar to the witness's testimony); *Pitta v. Astrue*, No. 5:11-CV-356-D, 2012 WL 3524829, at *4 (E.D.N.C. Aug.14, 2012) (unpublished) (finding no error in the ALJ's consideration of testimony by two lay witnesses where "[t]he ALJ's decision ma[de] clear that he evaluated [the lay witness] testimony collectively along with [claimant's] testimony and that, as a practical matter, he considered their testimony to be essentially consistent with [claimant's] testimony").

testimony essentially reiterated Plaintiff's testimony, any error in evaluating the former—such as the application of the objectionable boilerplate language found in *Mascio*— was harmless in light of the ALJ's sufficient credibility analysis of the latter. Put differently, the same reasons given for partially discounting Plaintiff's testimony are also relevant, valid, and applicable as to the partial discounting of Ms. Haymer's testimony.

## C. The ALJ's Step Five Analysis

Plaintiff's also contends that ALJ relied on flawed VE testimony to find that she could perform other jobs that existed in the national economy. (Docket Entry 7 at 15-16.) Here, based on VE testimony, the ALJ found that there were three jobs Plaintiff could perform: linen room attendant (reasoning level three, Linen Room Attendant, DOT § 222.387-030, *available at* 1991 WL 672098), laundry worker (reasoning level two, Laundry Worker, DOT § 361.685-018 *available at* 1991 WL 672987), and marker (reasoning level two, Marker, DOT § 369.687-026 *available at* 1991 WL 673074). (Tr. 95.)

However, even assuming that as Plaintiff contends the ALJ erred in adopting VE testimony regarding Plaintiff's ability to work as a linen room attendant because a reasoning level of three is inconsistent with the performance of simple, routine, repetitive tasks, the error was harmless. This is because the VE also testified that between the occupations of laundry worker and marker, there existed approximately 21,000 jobs in the national economy and no fewer than 700 in the state economy. (Tr. 95.) These two jobs are at reasoning level two and are consistent with Plaintiff's ability to perform simple, routine, repetitive work. (Tr. 95.) *See, e.g., Green v. Colvin*, No. 1:10CV561, 2013 WL 3206114, at *8-9 (M.D.N.C. June 24, 2013)

16

(unpublished), *report and recommendation adopted*, 2013 WL 4811705 (M.D.N.C. Sept. 9, 2013) (unpublished). This evidence thus provided sufficient support for the ALJ's conclusion that Plaintiff could make a successful adjustment to other work that existed in significant numbers in the national economy. *See, e.g., Hicks v. Califano*, 600 F.2d 1048, 1051 n. 2 (4th Cir. 1979) (110 jobs constitute a significant number). Any error here was harmless.

## D. **The Appeals Council**

Finally, Plaintiff argues that the Appeals Council erred in not considering a MSS from Dr. Andrea Taylor, dated December 13, 2013, submitted to the Appeals Council after the ALJ's decision. (Docket Entry 7 at 4-7 *referencing* Tr. 25-29; Docket Entry 12 at 1-5.) Specifically, Plaintiff asserts that Dr. Taylor's opinion related back to her mental condition prior to the ALJ's decision and, therefore, was "new and material" evidence warranting review by the Appeals Council. (Docket Entry 7 at 5.)

The Appeals Council must consider evidence submitted by a claimant with the request for review if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991); 20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1). Evidence is new if it is not duplicative or cumulative, and material if there is a "reasonable possibility that the new evidence would have changed the outcome of the case." *Wilkins*, 953 F.2d at 96. "[T]he Appeals Council must consider new and material evidence relating to that period prior to the ALJ decision in determining whether to grant review, even though it may ultimately decline review." *Id.* at 95. The Appeals Council need not review or consider new evidence that

relates only to a time period after the ALJ issues his decision. *See* 20 C.F.R. § 416.1476(b)(1).

In this case, in pertinent part, the Appeals Council "looked at" Dr. Taylor's MSS, and attached treatment notes, and concluded that they were new information about a later time and, therefore, did not affect the decision as to whether Plaintiff was disabled on or before May 28, 2013, the date of the ALJ's decision. (Tr. 2, 25-35.) The Appeals Council, therefore, found no basis for granting Plaintiff's request for review and did not receive this additional information in the record.[7] (*Id.* at 1, 6.)

Dr. Taylor's report is as follows. She identified Plaintiff's impairments as bipolar disorder and borderline personality disorder and described Plaintiff's symptoms. (Tr. 25.) She checked off boxes indicating that Plaintiff's mental impairments affected her ability to maintain attention and concentration for extended periods, would likely take her off-task more than 20% of the workday, would prevent here from completing a workday or workweek without the interruption of her symptoms, and would affect her ability to interact with other people in a workplace, including the general public and supervisors. (Tr. 25-27.) Dr. Taylor

---

[7] Where, as here, the Appeals Council declines to accept additional evidence, some courts in this circuit treat an appeal of that issue under "sentence six"[7] of 42 U.S.C. § 405(g), rather than "sentence four." *See, e.g., Barts v. Colvin,* No. 4:13-CV-23, 2014 WL 3661097, *9 (W.D.Va. July 22, 2014) (unpublished) (collecting cases). As explained above, the sentence four factors are that the evidence must be (a) new, (b) material, and (c) related to the period on or before the date of the ALJ's decision. *Wilkins,* 953 F.2d 93, 95-96. The sentence six factors are that the evidence (a) must be relevant to the determination of disability at the time the application was first filed; (b) the evidence must be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before her; (c) there must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (d) the claimant must make at least a general showing of the nature of the new evidence to the reviewing court. *See, e.g., Doll-Carpenter v. Comm'r,* 4:11-cv-28, 2012 WL 5464956, at *4 (W.D.Va. May 7, 2012) (unpublished) (citing *Miller v. Barnhart,* 64 Fed. App'x 858, 859 (4th Cir. 2003)). The Court need not resolve the issue of which test applies here because, given their overlapping nature, particularly on materiality, the result is ultimately the same.

18

also checked off boxes indicating that Plaintiff would be unable to consistently perform activities within a schedule, maintain regular attendance, and be punctual and to deal appropriately with the ordinary stresses of regular work activity. (Tr. 28.) Dr. Taylor opined that these symptoms and limitations applied since at least February 1, 2011 (Plaintiff's amended alleged onset date of disability). (*Id.*)

Plaintiff argues that the Appeals Council erred in concluding that Dr. Taylor's report was information about a later time because Dr. Taylor indicated that her responses applied since at least February 1, 2011. (Tr. 28.) Defendant, in turn, contends that while the date of a report is not necessarily dispositive of whether it relates to the relevant period, *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 341 (4th Cir. 2012), it cannot be assumed that Dr. Taylor's December 2013 opinion related to the relevant period given contrary evidence. In support, Defendant notes that Dr. Taylor did not begin treating Plaintiff until October 2013, five months after the ALJ's decision (Tr. 30) when Dr. Taylor replaced Dr. Benjamin. (Tr. 384-94, 401-409, 411-24, 431-333.) Defendant concludes that there is no indication that Dr. Taylor reviewed the records from Dr. Benjamin as far back as February 1, 2011. Thus, Defendant reasons, the Appeals Council reasonably concluded that the report was about a later time.

The Court concludes that any error here is harmless. This is because, even if Dr. Taylor's report related to the relevant period, her report is not new or material. It was not "new" because it is cumulative of evidence existing in the record and considered by the ALJ. The record already contained a similar MSS from Dr. Benjamin (Tr. 425-30) so Dr. Taylor's "new" MSS did not offer additional insight into Plaintiff's mental status. (Tr. 51-52.)

19

Nor was Dr. Taylor's report material. The severity of the limitations that were identified in Dr. Taylor's questionnaire were inconsistent with other evidence in the record, described in considerable detail throughout this Recommendation, including the mental status findings from CBC and the generally consistent GAF scores of 55. (Tr. 384-94, 395-424, 431-35.) Dr. Taylor's opinion was also inconsistent with her own examination report in October 2013, in which she indicated that Plaintiff had normal attention and concentration. (Tr. 33.) As stated above, the ALJ had before him Dr. Benjamin's similar MSS and afforded it little weight because he found it inconsistent with the clinical findings. (Tr. 51-52.) Given the similarity of the opinions, and their similar shortcomings, the undersigned can see no possibility that Dr. Taylor's report would have changed the ALJ's decision. The report and treatment notes are neither new nor material.

Plaintiff objects to this conclusion, asserting that it results from after-the-fact gap filling by the Commissioner. (Docket Entry 12 at 1-5.) The Court does not agree. First, rather than seeing this as an instance of impermissible *post-hoc* agency rationalization, the Court instead views this as Plaintiff's failure to meet her burden of demonstrating that the evidence in question meets the elements of the relevant inquiry and therefore requires a remand. Second, the Appeals Council does not need to explain its reason for denying review of an ALJ's decision. *Meyer v. Astrue*, 662 F.3d 700, 702 (4th Cir. 2011). Given this, and the fact that the evidence in question is not even part of the administrative record (Tr. 5), it would be unreasonable to estop the Commissioner from pointing out what the Court can easily see for itself, and which it has reasoned to independently; that is, that Dr. Taylor's MSS and

supporting documents are cumulative and immaterial. Third, other courts within the Fourth Circuit have likewise declined to remand in similar circumstances.[8] Any error is harmless.

## V. CONCLUSION

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, this Court **RECOMMENDS** that Plaintiff's Motion for Judgment Reversing Commissioner (Docket Entry 6) be **DENIED**, Defendant's Motion for Judgment on the Pleadings (Docket Entry 10) be **GRANTED** and the final decision of the Commissioner be upheld.

_____
Joe L. Webster
United States Magistrate Judge

August 24, 2015

---

[8] *See, e.g., Williams v. Colvin,* Civil Action No. 6:13-2907-TMC, 2015 WL 628504, *2, 4-5 (D.S.C. Feb. 12, 2015) (unpublished) (rejecting the argument that it would be a post hoc rationalization for "a magistrate judge [to] determine whether [a medical] Questionnaire would affect the decision of the ALJ"); *Saunders v. Colvin,* No. 5:12-CV-775-D, 2014 WL 1057024, at *7 (E.D.N.C. Mar. 17, 2014) (unpublished) (determining that a mental impairment questionnaire submitted to the Appeals Council was not new because the doctor based her questionnaire responses on her earlier treatment of the claimant, and those treatment notes were already contained in the record and considered by the ALJ); *Malloy v. Colvin,* 1:10-cv-420, 2013 WL 2147681, at *5 (M.D.N.C. May 16, 2013) (unpublished), *recommendation adopted,* slip op. (M.D.N.C. July 10, 2013) (unpublished).

21